# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Geraldine Soat Brown | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 371 | **DATE** | 7/6/2001 |
| **CASE TITLE** | | Zamora vs. Massanari | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the Court's Memorandum Opinion and Order, the plaintiff's motion for summary judgment [Dkt #16] is denied. The docket does not reflect that the Commissioner ever filed a cross-motion for summary judgment. The Commissioner may file a motion for summary judgment within 7 days of this Order, and the plaintiff must file any response thereto within 14 days thereafter. Enter Memorandum Opinion and Order.

*Geraldine Soat Brown*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | **JUL 6 2001** | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | **23** |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| kf | courtroom deputy's initials | 01 JUL -6 AM 9: 41 | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**DOCKETED**
JUL 6 2001

LOUIS ZAMORA,               )
       **Plaintiff,**       )
                       )
       **v.**                    )     **Cause No. 99 C 371**
                       )     **Magistrate Judge Geraldine Soat Brown**
**LARRY G. MASSANARI, Acting**   )
**Commissioner of Social Security**   )
**Administration,**              )
       **Defendant.**     )

## MEMORANDUM OPINION AND ORDER

Plaintiff Louis R. Zamora ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application under the Supplemental Security Income Act ("Act"), 42 U.S.C. 1382(c)(3)(C) for Supplemental Security Income ("SSI") benefits for a childhood disability. Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks summary judgment reversing the Commissioner's decision and awarding SSI benefits. [Dkt #16.] Although not part of the relief requested in Plaintiff's summary judgment motion, Plaintiff also argues in a reply memorandum filed in support of his motion that he is entitled either to judgment awarding benefits, or alternatively to a judgment remanding the case to the Commissioner for *de novo* review. [Dkt #20.] By consent of the parties under 28 U.S.C. § 636(c), this Magistrate's Opinion and Order shall be the final ruling on the motion. [Dkt ##12, 13.] For the reasons set forth below, the Court DENIES Plaintiff's motion for summary judgment.[1]

---

[1] The docket does not reflect that the Commissioner ever filed the customary cross-motion for summary judgment in favor of the Commissioner.

1



## PROCEDURAL HISTORY

Plaintiff, then a minor child acting through his mother, Sonia White, filed a claim for SSI benefits on September 26, 1994, alleging disability due to attention deficit disorder and learning disability commencing December 1, 1993, when he was nine and a half years old. (R. 29-37.)[2] His application was denied on March 13, 1995. (R. 55.) He filed a timely request for reconsideration (R. 59), and the Commissioner affirmed the denial of benefits on May 23, 1995. (R. 72.) Plaintiff next filed a timely request for an administrative hearing. (R. 75.) A hearing was held on May 20, 1997, before Administrative Law Judge ("ALJ") Irving Stillerman (R. 181), who rendered a decision denying Plaintiff's claim on August 21, 1997. (R. 13-22.) Plaintiff filed a timely appeal for review (R. 9), which was denied by the Social Security Administration Appeals Council on December 31, 1998. (R. 4-5.) On January 22, 1999, Plaintiff timely filed a Complaint for judicial review pursuant to 42 U.S.C. § 405(g). [Dkt #1.]

## BACKGROUND

Plaintiff was born May 24, 1983 in Narrows Park, Illinois. (R. 29, 186.) His parents separated shortly before Plaintiff's birth, and Plaintiff was raised by his mother, Sonia White. (R. 99.) Ms. White subsequently had two more children with a man who lived with the family for seven or eight years before he and Ms. White separated in November 1994. (R. 99.) At the time of the May 20, 1997 hearing before the ALJ, Ms. White reported that all three of her children were living with her, along with a different male friend. (R. 208.)

Plaintiff reportedly was sexually molested by an 11- or 12-year-old male cousin when

_____

[2] References ("R.") are to the certified administrative record prepared by the Commissioner and filed with this Court pursuant to 42 U.S.C. § 405(g).

2

Plaintiff was five years old. (R. 121.) Ms. White considers this incident to be the cause of Plaintiff's alleged outbursts of uncontrollable rage in his subsequent childhood years. (R. 202-04.) Plaintiff entered first grade at Portage Park public school in Chicago in 1989. He did not attend pre-school, and he was required to repeat the first grade because of his poor academic performance. (R. 101, 129.) After receiving Ds and Fs in his first year of school, he improved to Bs and Cs in the repeated first grade. He received Cs and one B in second grade, and in third grade (the 1992-93 school year) a C in reading and a D in math. (R. 129.) In fourth grade Plaintiff received several failing grades, and testing showed his reading and math skills were in the third grade range. (R. 117, 129.)

At the start of the 1994-95 school year–Plaintiff now was 11 years old and entering fifth grade–Ms. White sought assistance from the school social service department, complaining that Plaintiff was very difficult to control at home. (R. 117.) The school referred Plaintiff for evaluation by the Behavior Management Program of Illinois Masonic Medical Center, noting Plaintiff was behind his grade level and possibly could benefit from medication for attention deficit. (R. 116-17.) Illinois Masonic issued a report September 26, 1994, recounting Ms. White's complaints regarding Plaintiff's problem behavior at home. The report included evaluations by Plaintiff's prior-year and current school teachers, indicating no behavior problems at school, but noting limited attention span and hyperactivity that adversely affected his academic performance. (R. 117-127.) The Illinois Masonic report made no diagnosis or treatment suggestions, but the behavioral therapist who wrote the report suggested that Ms. White provide a copy of the report to Plaintiff's private physician to obtain drug therapy for Plaintiff's attention deficit. (R. 115, 120.)

Ms. White filed the application for SSI benefits on behalf of Plaintiff on the same date the Illinois Masonic report was issued. (R. 29.) Ms. White then brought Plaintiff to the family's physician, Dr. Brian Lynch, in October or November 1994, and apparently provided a copy of the

3

Illinois Masonic report to Dr. Lynch. Dr. Lynch subsequently described Plaintiff as appearing "perfectly normal" in two visits. (R. 111.) Although the doctor noted "I myself am somewhat doubtful of [the] diagnosis," nevertheless, relying on the reports of "others," the doctor prescribed a low dose of Ritalin (R. 112), which was increased when Ms. White reported no change (R. 112), and which Ms. White discontinued on her own initiative after about two months because she felt the medicine was not effective. (R. 93, 97-98.) (Plaintiff subsequently resumed Ritalin therapy, and testified at the hearing before the ALJ that the medicine helped him to control his outbursts of anger. (R. 170, 199.))

Upon receiving Plaintiff's application for SSI benefits, the Social Security Administration's Bureau of Disability Determination Services arranged for Plaintiff to undergo a psychological evaluation, which was carried out by Dr. Patricia Mather on December 1, 1994. (R. 79-81.) Dr. Mather administered the Wechsler Intelligence Scale for Children–III ("WISC–III") and performed other evaluations. She concluded that Plaintiff scored in the "borderline to intellectually deficient range of abilities for his age group." She noted Plaintiff displayed "significant perceptual spatial problems that are interfering with his academic performance," and recommended the Ms. White seek further evaluation for Plaintiff at his school. (R. 81.)

Dr. Mather reported the results of the WISC–III test as indicating Plaintiff obtained a verbal IQ score of 78, a performance IQ of 52, and a full scale IQ of 62. His scores for the WISC–III subtests were: information - 6; similarities - 7; arithmetic - 5; vocabulary - 5; comprehension - 7; picture completion - 1; picture arrangement - 1; block design - 1; object assembly - 2; and coding - 5. (R. 80.)

At about this time, in November 1994, Plaintiff's Ms. White and step-father ended their relationship, reportedly because of abusive behavior by the man toward Ms. White. (R. 87, 99.) Ms.

White then moved with her children to a new location in Chicago, and Plaintiff transferred from the fifth grade class at Portage Park School to the fifth grade class at Beaubien School. (R. 100-01.)

In March 1995, Beaubien School issued a Multidisplinary Conference Summary Report ("Beaubien Report") that included assessments of Plaintiff by teaching staff, social workers, a registered nurse, and a psychologist. (R. 86-104.) The Beaubien Report described Plaintiff as performing academically at the level of end of third grade. (R. 86, 101.) A psychological assessment indicated Plaintiff was "within the low average rate of mental development," with verbal skills significantly more developed than performance skills. (R. 102.) He once again underwent testing using the WISC–III examination. IQ totals were not reported, but Plaintiff's scores on the WISC–III subtests were listed, and indicated consistently higher scores than in the WISC–III examination taken just three months earlier. The March 1995 subtest scores were (for comparison, December 1994 subtest scores are shown in parentheses): information - 7(6); similarities - 9(7); arithmetic - 7(5); vocabulary - 8(5); comprehension - 7(7); picture completion - 3(1); picture arrangement - 4(1); block design - 2(1); and coding - 7(5). (R. 102.)

Plaintiff's teacher at Beaubien indicated in February 1995 that she found the results of the first (i.e., December 1994) WISC–III evaluation to be "surprising." She felt Plaintiff was doing "better than the scores indicate." She noted he was in a regular fifth grade class, and had to be able to "function pretty well because this is a class of thirty [pupils]." (R. 106.) In fact, Plaintiff's fifth grade year-end scores were all passing grades except an F in science. (R. 129.)

At the time of the hearing before the ALJ in May 1997, Plaintiff indicated he was completing seventh grade and expected to be advanced to eighth grade. (R. 188.) He attended special education classes for reading, mathematics, and science, and had done so since fifth grade. (R. 192.) Prior to the ALJ hearing, in February 1997, Ms. White sought additional behavioral counseling for Plaintiff,

indicating Plaintiff had continuing problems controlling his temper and obeying Ms. White's instructions at home, as well as having learning difficulties at school. (R. 167.) Ms. White had not previously sought psychological or behavioral treatment for Plaintiff, except to obtain the initial prescription of Ritalin from her family physician. (R. 204.) Plaintiff and Ms. White both commenced family therapy (R. 174), which still was continuing at the time of the ALJ hearing. (R. 192.) As part of this therapy Plaintiff underwent a psychiatric evaluation in April 1997. (R. 175-77.) Plaintiff was diagnosed as having combined attention deficit and hyperactivity disorder, oppositional disorder, and mathematics disorder. (R. 176.) The evaluating psychiatrist recommended that Plaintiff continue taking his current prescribed dose of Ritalin, continue participating in special education classes, and that Plaintiff and Ms. White continue their family counseling therapy. The psychiatrist also recommended that Plaintiff be encouraged to participate in sports activities, to "develop a sense of self-esteem and provide a structured setting outside school." (R. 177.)

## ALJ's DECISION AND PLAINTIFF'S OBJECTIONS

The ALJ considered the evidence summarized above, including the December 1994 and March 1995 psychological assessments. (R. 15-16.) He concluded that the medical evidence provided "some support for the claimant's alleged impairments [of attention deficit disorder and learning disability], but not to the extent alleged." (R. 16.) Regarding the non-medical evidence, he noted Plaintiff's record of learning difficulties, but also noted Plaintiff's improvement since he began taking special education classes. (R. 16.) The ALJ noted the reports of Plaintiff's two fifth grade teachers, which covered the period shortly after the alleged onset of Plaintiff's disability, and indicated that Plaintiff was easily distracted and had difficulty completing assignments, but also

6

indicated Plaintiff showed no behavioral problems or inability to get along with others. (R. 16.) The ALJ then referred to Ms. White's reports of Plaintiff's problem behavior at home. (R. 16.)

The ALJ concluded that this evidence did not qualify Plaintiff as suffering a "listed impairment" under the Social Security Administration's regulations related to child mental disorders ("Regulations"), 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112, nor did the evidence establish that Plaintiff suffered a degree of disability that could qualify as the "functional equivalent" of a listed impairment. (R. 20.) Accordingly, the ALJ determined that Plaintiff was not disabled under the terms of the Act, and not entitled to childhood disability benefits. (R. 20.)

Plaintiff contends that the ALJ's conclusion was erroneous in that the ALJ failed to consider the December 1994 psychological evaluation that indicated Plaintiff had a performance IQ of 52. Plaintiff argues that under the Act, this IQ rating constitutes a listed impairment under Section 112.05C of the Regulations. Hence, Plaintiff argues, on this basis alone Plaintiff should qualify for SSI benefits. (Pl.'s Mem. at 9-10 [Dkt #16].)

Plaintiff further contends the ALJ erred in failing to find Plaintiff's disability to be comparable to a listed impairment where, according to Plaintiff, the ALJ should have determined that Plaintiff had "marked limitations" in two of six prescribed domains of development or functioning: cognition and concentration. (Pl.'s Mem. at 10-11.)

In addition, Plaintiff contends that the ALJ made a derogatory comment about the validity of the December 1994 IQ assessment, by which comment the ALJ improperly made independent medical findings contrary to the evidence. (Pl.'s Mem. at 14.) The ALJ made this statement at the conclusion of the ALJ hearing, when counsel for Plaintiff cited the assessment of Plaintiff's performance IQ of 52 as constituting a listed impairment under § 112.05C of the Regulations. The ALJ remarked at the time:

I don't know about the validity of those things. You know, 52 is -- somebody 52, you, you – probably isn't able to go to the bathroom but, in any case, let's see what it says. I don't know. I, I haven't read them [the December 1994 evaluation].

(R. 209.)

As discussed further below, none of these contentions by Plaintiff are sufficient to require reversal of the denial of benefits.

## STANDARD OF REVIEW

The Social Security Act provides for limited judicial review of a final decision of the Commissioner (effectively that of the ALJ where, as here, the Appeals Council has denied the applicant's request for review). Where the ALJ commits an error of law, "reversal is required without regard to the volume of the evidence in support of the factual findings." *Imani v. Heckler*, 797 F.2d 508, 510 (7th Cir. 1986). With respect to the ALJ's conclusions of fact, the reviewing court's role is limited. There the role of the district court is only to determine whether the decision of the ALJ is supported by substantial evidence in the record. *Wolfe v. Shalala*, 997 F.2d 321, 322 (7th Cir. 1993). In reviewing the Commissioner's decision, the court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *Brown v. Chater*, 913 F. Supp. 1210 (N.D. Ill. 1996). Thus, this court does "not substitute [its] own judgment for that of the ALJ." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997). Rather, the court must affirm a decision supported by substantial evidence in the absence of an error of law. *Herr v. Sullivan*, 912 F.2d 178, 180 (7th Cir. 1990); *Edwards v. Sullivan*, 985 F.2d 334, 336-37 (7th Cir. 1993). Substantial evidence means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91

S. Ct. 1420 (1971)).

## THE COMMISSIONER'S ROLE

When evaluating a disability claim the Commissioner (or ALJ) must consider all relevant evidence and may not select and discuss only that evidence that favors his ultimate conclusion. *Herron*, 19 F.3d 329, 333. Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner (or ALJ), not the courts. *Herr*, 912 F.2d 178, 181; *see also, Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which he finds more credible). Where there is a conflict between medical opinions, the ALJ may choose between those opinions but may not substitute his own lay opinion for that of the medical professionals. *Davis v. Chater*, 952 F. Supp. 561, 566 (N.D. Ill. 1996). A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

The district court is limited to determining whether the ALJ's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Secretary of Health and Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992). This does not mean that the ALJ is entitled to unlimited judicial deference, however. In addition to relying on substantial evidence, the ALJ must articulate his analysis at some minimal level and state his reasons for accepting or rejecting "entire lines of evidence," although he need not evaluate in writing every piece of evidence in the record. *See Herron*, 19 F.3d at 333; *see also, Young v. Secretary of Health and Human Servs.*, 957 F.2d 386, 393 (7th Cir. 1992) (ALJ must articulate his reason for rejecting evidence "within reasonable limits" in

order for meaningful appellate review); *Guercio v. Shalala*, 1994 WL 66102, *9 (N.D. Ill. 1994) (ALJ need not spell out every step in his reasoning, provided he has given sufficient direction that the full course of his decision may be discerned) (citing *Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir. 1988.))

## DISABILITY STANDARD FOR CHILDREN

Before this Court considers the ALJ's findings it must first address the parties' disagreement as to which version of the Social Security statute applies to Plaintiff's case. Under the law in effect in 1995 when Plaintiff filed his claim, a child under the age of 18 was considered disabled if he or she suffered from "any medically determinable physical or mental impairment" of comparable severity to an impairment that would disable an adult. 42 U.S.C. § 1382c(a)(3)(A).[3] "Comparable severity" meant that a child's impairment so limited his ability to function independently and effectively in an age-appropriate manner that the impairment and resulting limitations were comparable to those that would disable an adult. 20 C.F.R. § 416.924(a). Plaintiff asserts that the ALJ should have applied that standard and conducted the following four-step analysis. Step One: Is the child engaging in substantial gainful activity? If so, the child is not disabled, and the analysis is ended. If not, then the analysis proceeds to the next step. Step Two: Does the child have a severe impairment, that is, an impairment or combination of impairments that significantly limits his ability

---

[3] In an adult, disability means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability "only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ... in significant numbers either in the region where such individual lives or in several regions in the country." 42 U.S.C. § 423(d)(2)(A).

to function independently, appropriately, and effectively in an age-appropriate manner? If no, then the child is not disabled and the analysis is ended. If yes, then the analysis proceeds to the third step. Step Three: Do the child's impairments meet or equal a listed impairment? If they do, the child is disabled and the analysis is ended. If they do not, the analysis proceeds to the fourth and final step. Step Four: Is the child's "individualized functional assessment"–considering the impact of the child's impairments on his overall ability to function independently and effectively in an age-appropriate manner–such that the child's impairments are of comparable severity to an impairment or impairments that would disable an adult? If yes, the child is disabled. If no, the child is not disabled. In either event, the analysis is ended.

However, by the time the Plaintiff's hearing was held before the ALJ in 1997, the law had changed. The standard for determining whether a child under 18 is eligible for disability benefits became more stringent in 1996 due to amendments to 42 U.S.C. § 1382c(a)(3)(A), resulting from the Personal Responsibility and Work Opportunity Act ("PRWOA"), Pub. L No. 104-193, § 211, 110 Stat. 2105 (1996). The PRWOA amended 42 U.S.C. § 1382c(a)(3) by striking the comparable severity language dealing with individuals under age 18 and adding the following definition of childhood disability:

> An individual under the age of 18 shall be considered disabled for the purposes of this subchapter <u>if that individual has a medically determinable physical or mental impairment, which results in marked or severe functional limitations,</u> and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i) (emphasis added). The new law further directed the Commissioner to discontinue the individualized functional assessment for children set forth in sections Title 20 of the Regulations, §§ 416.924d and e. The ALJ here applied the law as amended in 1996.

Plaintiff's assertion that the ALJ applied the wrong standard is incorrect. The amended

11

definitions apply in all cases filed on or after, or not finally adjudicated by, August 22, 1996. *Lishman v. Chater*, 1996 WL 650437, at \*7 (N.D. Ill. Nov. 6, 1996). A benefits claim is not considered finally adjudicated if a request for either administrative or judicial review is pending. *Id.* Plaintiff's case was not "finally adjudicated prior to August 22, 1996," and therefore the ALJ properly applied the amended standard when reviewing Plaintiff's claim. Plaintiff's reliance on *Jamerson v. Chater*, 112 F.3d 1064 (9ᵗʰ Cir. 1997) and *Quinones v. Chater*, 117 F.3d 29 (2d Cir. 1997), as requiring the application of the former standard, is misplaced. In *Jamerson,* the Court noted that its review was governed by the recent amendments, although the plaintiff's mother in that case had filed the initial application for benefits in 1992. 112 F.3d at 1065. However, because the ALJ had determined correctly that the plaintiff was not entitled to benefits under the former, more lenient, standard, it was unnecessary to review the plaintiff's claim under the newer, more stringent standard. *Id.* at 1068. In *Quinones,* the Commissioner expressly waived, for that case, any argument that the new standard should apply because the Commissioner had not promulgated regulations under the new law at the time the appeal was filed. 117 F.3d at 33, n.1. No such waiver is applicable here.

Under the amended statute, the sequential evaluation that the ALJ applied involves three steps. The first is to determine whether Plaintiff was engaging in substantial gainful activity. 20 C.F.R. § 416.924(a). The second step is to determine whether Plaintiff had a severe impairment or a combination of impairments that caused more than a minimal functional limitation. 20 C.F.R. § 416.924(c). The third step involves determining whether Plaintiff had a condition that met, medically equals, or functionally equals an impairment listed in 20 C.F.R. Part 404, App. 1, Subpt P, Regulations No.4. If the ALJ decides, as he did in this case, that Plaintiff's impairment does not meet or medically equal a listed impairment, then he must view the record as a whole in order to

determine whether the impairment is "functionally equal" to any listed impairment.[4] To make that determination, the ALJ must assess the impairment's impact on six domains of functioning: cognition;[5] communication;[6] motor abilities; social abilities;[7] personal/behavioral patterns;[8] and concentration, persistence and pace in task completion.[9]

---

[4] By functionally equal, the regulations mean that the impairment(s) must result in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain. 20 CFR § 416.926a(a). (See footnotes following for definitions of the six domains of functioning.)

[5] Cognitive functioning refers to a child's ability to progress in learning the skills involved in reading, writing, and mathematics. 20 C.F.R. § 416.924d(i)(1).

[6] Communicative functioning is defined as a child's ability to communicate pragmatically, in other words to meet the child's needs, and conversationally, *i.e.,* "to exchange information and ideas with peers and family or with groups such as [the child's] school classes in a spontaneous, interactive, sustained, and intelligible manner." 20 C.F.R. § 416.924d(i)(2).

[7] Social development and functioning is defined as the ability or inability to form and maintain relationships with other individuals and with groups; *e.g.*, parents, siblings, neighborhood children, classmates, teachers. Ability is manifested in responding to and initiating social interaction with others, sustaining relationships, and participating in group activities. It involves cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity appropriate to a child's age. Ability is also manifested in the absence of inappropriate externalized actions (e.g., running away, physical aggression–but not self- injurious actions, which are evaluated in the personal area of functioning), and the absence of inappropriate internalized actions (e.g., social isolation, avoidance of interpersonal activities, mutism). Social functioning in play, school, and work situations may involve interactions with adults, including responding appropriately to persons in authority (*e.g.*, teachers, coaches, employers) and cooperative behaviors involving other children. *Shaft v. Apfel*, 100 F. Supp. 2d 454 (E.D. Mich. 1999).

[8] The Regulations define the personal/behavioral function as a child's "ability to help [him]self and to cooperate with others in taking care of [his] personal needs and safety; to respond appropriately to authority and school rules; to manifest a sense of responsibility for [him]self and respect for others; to adapt to [his] environment; and to learn new skills." 20 C.F.R. § 416.924d(i)(5).

[9] The Regulations define "concentration, persistence, and pace" for Plaintiff's age group as the child's "ability to engage in an activity, such as playing or reading, and to sustain the activity for a period of time and at a pace appropriate to [the child's] age." 20 C.F.R. § 416.924d(i)(6). According to the Regulations, an impairment in this domain is moderate if the child is "frequently unable to complete age-appropriate complex tasks, and occasionally unable to perform simple age-appropriate tasks adequately." *Id.* § 416.924e(c)(2)(ii).

The Court finds that the ALJ was correct in applying the standards effective after the 1996 amendment and the Court reviews the ALJ's decision under the current standard to determine if there is a basis for reversal.

## THE ALJ'S OPINION

In his August 21, 1997 opinion, the ALJ found that Plaintiff was not engaged in substantial gainful activity, and had a severe impairment. (R. 14.) Thus, Plaintiff satisfied Steps 1 and 2 of the Regulation's evaluation process. Next, at Step 3, the ALJ found that Plaintiff did not qualify for SSI benefits because his "impairments are not listed in [the Regulations], nor do they equal in severity the most closely analogous listing sections."[10] (*Id.*) The ALJ then applied the "functionally equal" test, considering each of the four methods of establishing functional equivalence. (R. 15.) The ALJ found, first, that Plaintiff's impairments did not produce a limit on a specific function that is the same as the limit of any of the specific functional limitations included among the listing sections and therefore he was not disabled under 20 C.F.R. § 416.926a(b)(1). Second, the ALJ found that Plaintiff did not suffer from any episodic impairment and therefore the method of analysis under 20 C.F.R. § 416.926a(b)(3) was not applicable. Third, the ALJ found that Plaintiff's treatment (medication) did not produce any independent functional limitations, nor did Plaintiff experience any seriously limiting side effects from its use. Thus, the ALJ concluded that 20 C.F.R. § 416.926a(b)(3) did not apply. (R. 17.)

The final method of establishing functional equivalence requires an assessment of the severity of any functional limitations produced by Plaintiff's impairment(s). A finding of two

_____

[10] The ALJ listed §§ 112.05 Mental Retardation, 112.08 Personality Disorder, and 112.11 Attention Deficit Hyperactivity Disorder as the most closely analogous sections. (R. 14.) These sections are defined in 20 C.F.R. Part 404, App. 1, Subpt P.

"marked" limitations or one "extreme" limitation establishes disability. *See* § 416.926a(a) and (b)(2). The ALJ evaluated the five required areas of functioning and made the following findings.

*Cognitive/communicative* – The ALJ found that there was "evidence of some limitation, but that it was short of being 'marked'." (R. 18.) He noted that Plaintiff was a slow learner but that his grades had improved and he exhibited steady progress. (*Id.*) He concluded that in terms of cognitive skills, Plaintiff's communication skills compensated for other cognitive weaknesses so that his impairment was "less than marked." (R.18, 21.)

*Motor functioning* – The ALJ found that Plaintiff had not alleged any limitation and there was "no documentary evidence to suggest any problem in this area." (R. 19, 21.)

*Social functioning* – The ALJ noted that a mental health assessment performed in February 1997 revealed that Plaintiff had limited insight and a poor ability to abstract. (R. 16.) However, the ALJ stated, "the record disclosed that Plaintiff is able to make friends and while he does have a tendency to misbehave at home, he responds appropriately to persons in authority at school and does not exhibit inappropriate or bizarre behavior at school." (R. 19.) The ALJ then concluded that there was no evidence of a limitation in this area. (R.19, 21.)

*Personal Functioning*- The ALJ found that the evidence did not suggest any problems in this area. (R. 19, 21.)

*Concentration, persistence, pace*- The ALJ stated that the record shows that Plaintiff is easily distracted and has been inconsistent in turning in homework. (R. 19.) The ALJ concluded that Plaintiff was showing improvement in these areas, therefore any limitation was less than marked. (*Id.*)

After looking at the required areas of functioning, the ALJ concluded that the medical evidence provided some support for Plaintiff's alleged impairments, but not to the extent alleged.

(R. 16.) He ruled that Plaintiff was not disabled because Plaintiff did not have two "marked" functional limitations or one "extreme" functional limitation and therefore Plaintiff had failed to establish any functional equivalence. (R. 20-21.)

## ARGUMENTS ON APPEAL

As noted above, in his appeal to this Court, Plaintiff argues that the ALJ's decision is erroneous for three reasons: First, the decision is not supported by substantial evidence (Pl.'s Mem. at 7); Second, the ALJ made an error of law in failing to articulate valid reasons why he rejected Social Security's own doctor's test results showing that Plaintiff had a performance IQ of 52 (Pl.'s Mem. at 11); Finally, Plaintiff contends the ALJ erred in making his own independent medical findings that a person with a performance IQ of 52 would be "unable to go to the bathroom. . ." (Pl.'s Mem. at 14.)

The Commissioner responds that Plaintiff failed to carry his burden and show that he has mental retardation, because neither of the psychologists who administered the IQ test specifically diagnosed mental retardation. (Def.'s Mem. at 10 [Dkt #19].) The Commissioner states that the ALJ was not required to articulate reasons for rejecting the Performance IQ score of 52 because the "doctor's diagnosis supported the ALJ's conclusion that Plaintiff did not meet the mental retardation listing." (*Id.* at 11.) Finally, the Commissioner contends that the ALJ reasonably found that Plaintiff did not functionally equal the requirements of the mental retardation listing. (*Id.* at 12.)

## ANALYSIS

Plaintiff emphasizes in particular his argument that the ALJ erred as a matter of law in failing to find Plaintiff disabled where Plaintiff's WISC-III test score in December 1994 showed a performance IQ of 52. Plaintiff argues that, where the ALJ did not even so much as mention this

16

IQ result, the ALJ improperly disregarded an entire "line of evidence"–one that should have qualified Plaintiff as disabled as a matter of law–without articulating a reason. (Pl.'s Mem. at 12; Pl.'s Reply Mem. at 2 [Dkt #20].) Plaintiff contends the December 1994 WISC-III test score indicating a performance IQ of 52 constitutes listed impairment 112.05C under 20 C.F.R. Part 404, Subpart P, Appendix 1. (Pl.'s Mem. at 10; Pl.'s Reply Mem. at 1.) Alternatively, Plaintiff contends that the ALJ disregarded substantial evidence that showed Plaintiff's impairment functionally equals a listed impairment in §112.05C. (Pl.'s Mem. at 10-11; Pl.'s Reply Mem. at 5.)

Section 112.05C defines the listed impairment of mental retardation as existing where evidence shows the claimant has "[a] valid verbal, performance, or full scale IQ of 59 or less." As discussed above, the December 1994 WISC-III test results showed Plaintiff with a performance IQ of 52. Plaintiff's argument raises three primary issues: first, whether the December 1994 IQ score constitutes, by itself, substantial proof that Plaintiff meets the listing under § 112.05C. Second, whether the ALJ committed an error of law by failing to make any reference to the IQ score of 52 (or indeed, specific reference to any of the other IQ scores) in his written decision. Ancillary to this second issue is whether, as Plaintiff contends, the ALJ's dismissive comments at the hearing as to the probative value of the IQ score of 52 constitute legal error of substituting the ALJ's own opinion for that of the medical evidence. Third, whether substantial evidence apart from the IQ score of 52 requires the conclusion that Plaintiff's impairment is the functional equivalent of §112.05C or any other listed impairment.

## 1. Does the IQ Score of 52 Automatically Qualify Plaintiff under 112.05C?

As to the first issue, the mere fact that the record includes the performance IQ test score of 52 does not automatically require the Commissioner to find the claimant disabled under the listing of impairments. *Strunk v. Heckler*, 732 F.2d 1357, 1360 (7th Cir. 1984). The court in *Strunk* noted:

The plaintiff has failed to supply this court, nor have *we* found any case law requiring the Secretary to make a finding of mental retardation based *solely* upon the results of a standardized intelligence test in its determination of mental retardation.

732 F.2d at 1360, emphasis in original. The Seventh Circuit has not disavowed this opinion, hence *Strunk* remains the applicable law in this Circuit.

*Strunk* involved an adult claimant rather than a child. However, the Social Security Administration's regulations pertaining to evaluating mental disorders in children apply the same reasoning as in *Strunk*. The Regulations emphasize that claims of disability based on mental disorder in a child "must be documented on the basis of reports from acceptable sources of medical evidence." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.00D. These sources of medical evidence may include standardized tests and/or other medical findings. However, the evidence must include not only reports based on clinical examination, but "whenever possible," the reports also must reflect consideration of "information from parents or other concerned individuals who are aware of the child's activities of daily living, social functioning, and ability to adapt to different settings and expectations." *Id.* Hence the Regulations support the reasoning in *Strunk,* that the report of an IQ score that meets the listed impairment is not sufficient, by itself, to prove the claimant satisfies the requirements for the listing.

The Regulations elaborate on this caution against relying exclusively on an IQ test score by noting, where psychological tests are involved such as the December 1994 IQ evaluation cited by Plaintiff, the test must reflect "appropriate characteristics of validity, reliability, and norms." *Id.* The Regulations define these characteristics as follows:

> The salient characteristics of a good test are: (1) Validity, *i.e.,* the test measures what it is supposed to measure, as determined by appropriate methods; *(2) reliability, i.e., the consistency of results obtained over time with the same test and the same individual;* and (3) appropriate normative data, *i.e.,* individual test scores must be

18

comparable to test data from other individuals or groups of a similar nature, representative of that population. *In considering the validity of a test result, any discrepancies between formal test results and the child's customary behavior and daily activities should be duly noted and resolved [by the medical report].*

*Id.*, emphasis added.

On the issue of reliability of standardized IQ tests, the Regulations caution that, in addition to consistency in the test from one examination to another, the test results also must be "sufficiently current for accurate assessment." *Id.* For tests administered to a child in Plaintiff's age group, a test indicating the IQ as 40 or above is considered sufficiently current only if it was administered within two years of the ALJ's hearing. *Id.; and see, Rucker v. Apfel,* 141 F.3d 1256, 1260 (8th Cir. 1998); *Anderson v. Commissioner of Soc. Sec.*, 198 F.3d 244, 1999 WL 1045072, *3, *6 (6th Cir. 1999).

Plaintiff's December 1994 IQ score fails to meet these requirements for reliability. The December 1994 test is not consistent with the test taken only three months later, in March 1995. The March 1995 test showed that the Plaintiff's subtest scores, on which the IQ score is based, were significantly higher in all but one category compared to the December 1994 subtest scores. Although the March 1995 report does not list the summary IQ scores, it is evident that these summary IQ figures would be significantly higher also, given the higher subtest scores. Hence the ALJ was entitled to discount the importance of the December 1994 score. *Anderson v. Apfel,* 996 F.Supp. 869, 873 (E.D.Ark. 1998)(focus on subtest scores is necessary especially where there is a discrepancy between various IQ scores). The ALJ was not required to base a finding of disability on either the December 1994 or the March 1995 IQ evaluations, where both of these reports were more than two years old at the time of the May 20, 1997 hearing. Under the regulations, both reports no longer met the requirement for being current.

There also was doubt about the reliability of the December 1994 IQ scores expressed by a

"concerned individual" who was "aware of [Plaintiff's] activities of daily living, social functioning, and ability to adapt to different settings and expectations," as required by the Regulations. 20 C.F.R. Part 404, Subpart P, Appendix 1, §112.00D. As noted above, the Regulations emphasize the importance of such opinions in evaluating the IQ scores. *Id*. The record contains the February 1995 comment of Plaintiff's school teacher, who remarked that she was "surprised" by the December 1994 report, and believed Plaintiff was doing "better than [the December 1994] scores indicate." (R. 106.)

The record in this case illustrates the importance of the ALJ's considering all of the evidence in addition to the IQ score before arriving at his conclusion. It is apparent from the ALJ's written report that the ALJ did consider all this evidence. (R. 15-16, 18-20.) This Court's function is not to reweigh the evidence considered by the ALJ, but merely to confirm that the ALJ did consider all the evidence, and that the substantial weight of that evidence supports the ALJ's determination. *Herron*, 19 F.3d at 333 (7th Cir. 1994).

Thus, Plaintiff's performance IQ score of 52 on one test does not automatically establish that he meets a listed impairment. Moreover, that IQ score is not reliable evidence under the Social Security Administration's regulations, in that it is neither current nor consistent with Plaintiff's higher scores on a subsequent IQ evaluation, nor did Plaintiff's school teacher feel this score accurately reflected Plaintiff's ability and achievement. Hence the Commissioner could conclude that the IQ score of 52 did not, by itself, qualify Plaintiff as entitled to SSI benefits under the Act.

## 2. Does the ALJ's Failure to Cite the IQ Test Scores Invalidate His Determination?

Plaintiff characterizes the ALJ's failure to mention specifically the IQ score of 52 as being an error of law in that purportedly the ALJ wrongfully rejecting an entire line of evidence without explaining his reason for doing so. (Pl.'s Mem. at 12.) Plaintiff argues:

It is not possible for this Court to evaluate whether the ALJ's decision

20

is supported by substantial evidence because the ALJ provided no legitimate explanation for accepting or rejecting Dr. Maher's opinion [including the IQ score of 52]. Such an unsubstantiated decision to discard an entire line of evidence cannot form the basis for meaningful judicial review.

(Pl.'s Mem. at 13-14.)

Plaintiff cites numerous cases for the proposition that the ALJ must explain his decision to reject entire lines of evidence. (Pl.'s Mem. at 12-14.) However, none of those cases stand for the proposition that failure to cite a specific IQ test score constitutes rejection of an entire "line of evidence." Nor do these cases hold that the ALJ's failure to mention an IQ score in his recitation of the evidence automatically requires the Court to conclude that it cannot evaluate whether the ALJ's decision is supported by substantial evidence.

Indeed, Plaintiff cites a string of cases to the contrary, that the ALJ "need not spell out every step in [his] reasoning, provided [he] has given sufficient direction that the full course of [his] decision may be discerned." (Pl.'s Mem. at 12-13, citing *Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir. 1988.)) Here, even though the ALJ did not refer specifically to IQ scores, his decision does give detailed direction from which the Court can discern the validity of his reasoning.

Moreover, although the ALJ does not mention the specific IQ scores, it is evident that the ALJ considered the Dr. Maher's report which included the first WISC-III test administered to Plaintiff in December 1994. The ALJ refers to Dr. Maher's report in summarizing the evidence he reviewed, quoting verbatim the summary that concludes Dr. Maher's evaluation, stating that Plaintiff scored "in the borderline to intellectually deficient range of abilities for his age group." (R. 15, quoting 81.) Similarly, the ALJ reiterated verbatim the conclusion of the subsequent WISC-III test result in March 1995, which evaluated Plaintiff as being in the " 'low average' range 'of mental development.' " (R. 15, quoting 102.) These verbatim quotations refute Plaintiff's contention that

21

the ALJ disregarded the December 1994 WISC-III test results.

Plaintiff characterizes the December 1994 test result of a performance IQ of 52 as a "line of evidence" that the ALJ ignored. However, this single WISC-III test score is not a *line* of evidence, but more a *point* along the line of evidence of IQ testing and other indicia of Plaintiff's mental abilities. The ALJ's ruling demonstrates that the ALJ has considered the full spectrum of those points along a line. His report summarizes every piece of evidence in the record, and ties the evidence into each category of evaluation required by the regulations. (R. 18-20.) This Court is not to conduct that evaluation *de novo*, but is to determine only whether the ALJ did in fact base his evaluations on the substantial evidence in the record, and whether that record was developed sufficiently to make possible a decision on whether Plaintiff was disabled under the Act. *Strunk*, 732 F.2d at 1364. As discussed further below, the Court concludes that the ALJ's decision complies with these requirements.

The present case is distinguishable from *Hall v. Apfel*, 122 F.Supp.2d 959 (N.D.Ill. 2000), another case involving a child's claim of disability due to mental retardation. As in the present case, the Commissioner in *Hall* denied the claimant's application for benefits despite evidence of an IQ test score that met a listed impairment. In *Hall*, as here, the record included a report indicating the claimant's scores on the WISC-III exam. The report indicated a performance IQ and full scale IQ that met the qualifications for a listed impairment under § 112.05D.[11] *Id.* at 964-65. The

---

[11] Section 112.05D applies where there is "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant limitation of function." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.05D; *Hall v. Apfel*, 122 F.Supp.2d 959, 964-65 (N.D.Ill. 2000). Plaintiff in the present case does not contend that his condition meets this definition or is functionally equivalent to § 112.05D. Plaintiff directs his argument only to the requirements for § 112.05C. Nevertheless, the ALJ's decision discusses the issues relevant to both listings, and his analysis of the evidence supports the conclusion that Plaintiff meets neither of these listings.

psychologist drafting this report concluded that the claimant was "in the mild range of mental retardation." *Id.* at 962. Despite this evidence, the ALJ determined the claimant was not mentally retarded and did not meet the requirements for a listed impairment. *Id.* at 963. In his analysis, the ALJ in *Hall* referred to the report that contained the IQ scores, but did not make any explanation why the IQ scores did not qualify the claimant for the § 112.05D listing. Nor did the ALJ refer to the requirements of §112.05D, but instead based his analysis on the requirements of § 112.05E.[12] The ALJ also made no explanation for ignoring the report's conclusion that the claimant was mildly mentally retarded. *Id.* at 964, n. 2.

In reversing the Commissioner's decision, the court in *Hall* noted there was no evidence in the record that contradicted the report of Plaintiff's low IQ scores. The court noted further that the ALJ made no comment suggesting he questioned the credibility of the report's conclusion that the claimant was mildly mentally retarded. *Id.* at 964. The court concluded that the ALJ "failed to provide a rational basis for the denial of benefits," and, accordingly, the court remanded the case to

---

[12] 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.05E provides that a claimant age 3 to 18 meets the requirements for a listed impairment of mental retardation if there is a valid verbal, performance, or full scale IQ of 60 through 70, and one of the following conditions exist, as set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.02B2:

    (a)    Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

    (b)    Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) including, if necessary, appropriate standardized tests; or

    (c)    Deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner.

the ALJ for evaluation specifically under § 112.05D. *Id.* at 967.

*Hall* differs from the present case. In *Hall* there was no evidence that the IQ scores reported were invalid or unreliable. In the present case, as noted above, the December 1994 WISC-III score was questioned by Plaintiff's school teacher in February 1995 and undermined by the second WISC-III examination in March 1995. Moreover both of Plaintiff's WISC-III test reports were more than two years old at the time of the ALJ hearing, and hence no longer qualified as current. Accordingly, unlike *Hall*, in the present case this Court can find substantial evidence that a reasonable mind might accept to support the conclusion that the performance IQ score of 52 in the December 1994 report is not sufficient by itself to qualify Plaintiff as meeting the 112.05C listing. *Strunk*, 732 F.2d at 1359 (defining "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.")

Further unlike *Hall*, in which the ALJ never voiced any question about the credibility of the IQ scores, in the present case the ALJ indicated during the May 20, 1997 hearing that he questioned a performance IQ of 52, remarking that with such a low IQ Plaintiff would not even be able to use the bathroom without assistance. (R. 209.) There is no indication the Plaintiff had any significant functional limitations of this kind. On the contrary, Plaintiff reportedly was good at physical activities such as baseball (R. 199, 206), and, though he required prodding to perform such tasks, Plaintiff carried out household chores such as cleaning the floor and taking out the trash. (R. 198, 206.) Ms. White also sent him to do grocery shopping on his own, even though she complained that he sometimes had difficulty remembering her instructions. (R. 201.)

Plaintiff characterizes the ALJ's comment about the IQ score as an indication the ALJ improperly made medical findings by substituting his own opinions in place of expert evidence in the record. (Pl.'s Mem. at 14.) On the contrary, this Court interprets the ALJ's remark, taken in its

24

full context, as showing that the ALJ, while expressing scepticism about the reliability of such a low score, intended to review the evidence of the IQ score in light of other evidence before deciding on its probative value. (". . . somebody 52, you, you – probably isn't able to go to the bathroom <u>but, in any case, let's see what it says. I don't know. I, I haven't read them</u>" (R. 209, emphasis added.))

The ALJ is entitled to discount reports of IQ scores that conflict with other evidence. *Pfeister v. Bowen*, 673 F.Supp 723, 730 (W.D.Pa. 1987), cited with approval by *Howard v. Sullivan*, 1990 WL 16787, Fn. 7 (N.D.Ill. 1990). Mere existence of such a conflict in the evidence does not require the court to remand the case. Such conflicts are to be resolved by the Social Security Administration, not the court. *Pfeister*, 673 F.Supp. at 730; *Strunk,* 732 F.2d at 1364. Accordingly, this Court finds that the ALJ's comment about the probative value of the IQ test score does not provide a basis for reversing his decision. Furthermore, the Court finds that the ALJ's failure to mention the IQ score specifically in his decision likewise does not justify reversal of the decision.

### 3. Does Substantial Evidence Indicate Plaintiff's Condition Is the Functional Equivalent of a Listed Impairment?

After concluding the Plaintiff's condition did not meet the requirements for any listed impairment, the ALJ properly considered whether the evidence showed Plaintiff's condition to be the functional equivalent of one of the listings. (R. 18-20.) The ALJ determined the evidence did not indicate functional equivalence. (R. 20.) The Court finds that the ALJ followed the required process of analysis in making this determination, and that substantial evidence supports his conclusion.

As noted above, to determine whether Plaintiff's condition is the functional equivalent of a listed impairment, the ALJ must evaluate Plaintiff in six domains of development or function: cognition; communication; motor abilities; social abilities; personal/behavioral patterns; and

concentration, persistence and pace in task completion. The Commissioner must find the claimant disabled if evidence shows a "marked" limitation in any two of these domains, or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a.

For a child in Plaintiff's age group, a limitation is considered "marked" if the impairment "seriously interferes with [the claimant's] ability to independently initiate, sustain, or complete activities." A limitation is "extreme" if the impairment "*very* seriously" interferes with these capabilities. 20 C.F.R. § 416.926e(2)(i) and (3)(i) (emphasis added).

The ALJ found no impairment that met these levels of interference with Plaintiff's ability to function. As to cognitive ability, the ALJ noted there was evidence of "some" limitation in this area, but the record showed that although Plaintiff was "a slow learner and needs reinforcement, his grades have improved and he is exhibiting steady progress in his cognitive abilities." (R. 18.) The ALJ noted there was no evidence at all of impairment in communication ability or personal functioning, and not even a claim of impairment in motor functioning. (R. 18-19.) Regarding social functioning, the ALJ cited evidence showing Plaintiff "is able to make friends," and although Plaintiff "does have a tendency to misbehave at home, he responds appropriately to persons in authority at school and does not exhibit inappropriate or bizarre behavior at school." (R. 19.) As to the function of concentration, persistence, and pace, the ALJ concluded there was evidence that although Plaintiff "is easily distracted and has been inconsistent in turning in his homework assignments due to poor study habits, he is showing improvement in these areas." (R. 19.)

Plaintiff challenges the ALJ's conclusions as to the severity of Plaintiff's impairment in cognitive function and concentration. (Pl.'s Reply Mem. at 5.) However, Plaintiff points only to Dr. Maher's report in December 1994, which, as noted above, the ALJ reviewed along with the other evidence including evidence about Plaintiff's subsequent performance in school. (R.18-19.) The

26

Court finds that the ALJ's conclusion was supported by substantial evidence. Accordingly there is no basis to reverse the ALJ's determination on the issue of functional equivalence.

## CONCLUSION

The Court finds that substantial evidence supports the Commissioner's determinations that Plaintiff does not meet a listed impairment under the Regulations, and that Plaintiff's limitations are not the functional equivalent of a listed impairment. The Court also finds that there is no error of law that requires reversal of the Commissioner's decision to deny benefits to the Plaintiff. Accordingly, Plaintiff's motion for summary judgment is DENIED.

**IT IS SO ORDERED.**

**GERALDINE SOAT BROWN**
**United States Magistrate Judge**

**DATED: July 6, 2001**